# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
October 16, 2014

Plaintiff-Appellee,

v

No. 316532
Marquette Circuit Court
LC No. 12-051000-FH

THOMAS JOHN RICHER, JR.,

Defendant-Appellant.

Before: MURPHY, C.J., and SAWYER and M. J. KELLY, JJ.

PER CURIAM.

Defendant, Thomas John Richer, Jr., appeals by right his bench conviction of attempting to carry a concealed weapon. MCL 750.227; MCL 750.92. The trial court sentenced Richer to serve a deferred sentence of 2 months in jail with credit for 55 days already served and to serve 18 months on probation. On appeal, Richer argues the trial court erred when it determined that the arresting officer had a reasonable suspicion sufficient to warrant the traffic stop that led to the discovery of his concealed firearm. Because the officer did not have a reasonable suspicion, he maintains, the trial court should have granted his motion to suppress. We conclude the trial court did not err when it denied Richer's motion to suppress; accordingly, we affirm.

## I. BASIC FACTS

Deputy Ryan Leuzzo, who is an officer with the Marquette County Sheriff's Department, pulled Richer over at around midnight in December 2012.[1] Leuzzo pulled Richer over to investigate an anonymous tip that Richer might be driving under the influence of alcohol. After Leuzzo conducted field sobriety tests, he asked Richer if he had any weapons in his truck and Richer admitted that he had a gun in his jacket, which he had left in the truck. Other officers searched the truck and found a loaded .40 caliber handgun, 5 loaded magazines, 3 knives, and a spent shell casing. Richer did not have a license to carry a concealed firearm at the time.

---

[1] Records show that Richer was on probation at the time of the stop.

Richer's lawyer moved to suppress the evidence discovered in the search of Richer's truck. Richer's lawyer argued that Leuzzo did not have a reasonable suspicion sufficient to justify stopping Richer. The trial court held a hearing on the motion in January 2013.

Leuzzo testified that he was working on the night at issue when central dispatch issued a BOL—a "be on the lookout"—for Richer. Central dispatch indicated that a person, who identified herself as a coworker, called from Remie's bar in Marquette and stated that Richer had just left the bar and was possibly driving under the influence of alcohol. She said she was concerned for Richer's female passenger and warned that Richer "was a known felon and known to carry firearms." The caller identified Richer's truck, gave his license plate number, and stated that he was driving from the bar to the Midtown Apartments in Ishpeming, Michigan.

Leuzzo was a few miles from the bar and coordinated with other officers to intercept Richer. After a truck matching the description of Richer's truck passed him, Leuzzo turned around and began to follow it. Leuzzo verified that the truck's license plate was registered to Richer and, after waiting for his backup to near, he stopped Richer. Leuzzo did not see Richer driving erratically prior to the stop.

Leuzzo approached the truck carefully "because in the back of [his] mind [he] did know that there was possible weapons." He asked Richer to keep his hands on the steering wheel, which he did. He then asked Richer if he had any weapons and Richer told him that he had a knife in his pocket. Leuzzo asked Richer to put the knife in the center console and Richer did. Leuzzo also asked Richer if he had been drinking and Richer admitted that he had. Leuzzo asked Richer to "step out of the vehicle" to perform a field sobriety test. Leuzzo administered the tests, which Richer performed well. He also administered a breathalyzer and the results from that test later showed that Richer was under the legal limit.

At the close of proofs, the trial court and the parties' lawyers discussed whether this Court's decision in *People v Barbarich*, 291 Mich App 468; 807 NW2d 56 (2011), governed the result. After hearing the lawyers' arguments, the trial court asked the prosecutor whether an officer would always be justified in stopping someone who left a bar on the basis of such an anonymous call:

> So if at any time a citizen goes into a licensed establishment—Mr. Hyde [referring to Richer's lawyer] goes and sits down at the bar, another person comes in after who doesn't know how long he's been there, doesn't know how much he's been drinking, sees Mr. Hyde drink a twelve ounce bottle of beer, get up and leave, that person calls central dispatch, I think attorney George Hyde might be driving drunk. We have enough to stop Mr. Hyde?

Given the majority decision in *Barbarich*, the prosecutor argued that a reasonable officer would be justified in stopping someone under those facts:

> I believe we do, your Honor. You don't have to have a great amount of detail about the possible bad driving. But if you've got enough to have a reasonable officer conclude there's a chance this person is drunk, this decision [*Barbarich*] authorizes, you know, a Terry stop. It's not a long stop. Get in there,

it doesn't take too long to figure out if the person's under the influence or not. And you want to err on the side of caution rather than having, you know, lo and behold, the person goes off and hits and kills somebody.

The trial court ultimately agreed with the prosecutor's analysis. The court recognized the dilemma that any officer would confront when presented with similar facts: "What's an officer to do when you get that information and then you see the vehicle? Do you ignore it or do you make a stop to investigate?" It concluded that a reasonable officer would investigate further on the basis of the anonymous call:

> But I think—and, in response to my last question, the fact that a citizen may be in a bar having a drink, that this decision [*Barbarich*] would put the citizen at risk of being stopped by police because somebody calls in, given the fact that this is an investigative stop, and weighing the totality of the circumstances, the harm of the investigative stop, in my view, is not outweighed by the risks that are posed by drunk drivers on the road. And it may well be a salutary effect that if I decide to go to a bar and have a drink that I will not drink to excess because I may well be called in by a[n] alert citizen that's concerned about me drinking too much.

> And if we put all of that in the balance and the scales, I think the officer was reasonable in making the stop and did have a reasonable suspicion. It turned out to be wrong, but suspicions often are . . . .

The trial court denied Richer's motion to suppress for those reasons.

After the hearing on the motion to suppress, the prosecutor agreed not to prosecute the original charge of carrying a concealed weapon in exchange for Richer proceeding to a bench trial on a new charge of attempting to carry a concealed weapon. The trial court held the bench trial in April 2013 and found Richer guilty.

Richer now appeals in this Court.

## II. MOTION TO SUPPRESS

## A. STANDARD OF REVIEW

On appeal, Richer argues that the trial court erred when it denied his motion to suppress. Specifically, he contends that the anonymous tip was insufficient to give Leuzzo a reasonable suspicion that Richer might be driving under the influence of alcohol because the caller did not indicate that she saw Richer driving erratically and the subsequent investigation showed that the caller could not have witnessed Richer consume more than one drink at the bar. This Court reviews de novo a trial court's decision on a motion to suppress. *People v Reese*, 281 Mich App 290, 294; 761 NW2d 405 (2008). However, we review for clear error the trial court's factual findings underlying its decision. *Id.*

## B. INVESTIGATORY STOPS

"Both the United States Constitution and the Michigan Constitution protect persons against unreasonable searches and seizures." *Id.*, citing US Const, Am IV; Const 1963, art 1, § 11; and *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). "Generally, searches and seizures conducted without a warrant are presumptively unreasonable and, therefore, unconstitutional." *Barbarich*, 291 Mich App at 472, citing *People v Champion*, 452 Mich 92, 98; 549 NW2d 849 (1996). Nevertheless, the United States Supreme Court has recognized several exceptions "to the general rule that warrantless searches are unreasonable using a test that 'balances the governmental interest that justifies the intrusion against an individual's right to be free of arbitrary police interference.'" *Id.*, quoting *People v Faucett*, 442 Mich 153, 158; 499 NW2d 764 (1993).

One such exception to the warrant requirement is the exception for investigatory stops first stated in *Terry v Ohio*, 392 US 1; 88 S Ct 1868; 20 L Ed 2d 889 (1968). Under that decision, "if a police officer has a reasonable, articulable suspicion to believe a person has committed or is committing a crime given the totality of the circumstances, the officer may briefly stop that person for further investigation." *Barbarich*, 291 Mich App at 473. "When a court is called upon to determine whether a defendant's Fourth Amendment rights have been violated in the context of a *Terry* stop, it should view the totality of the circumstances in light of commonsense judgments and inferences about human behavior, and should be careful not to apply overly technical reviews of a police officer's assessment of whether criminal activity is afoot." *Id.* at 474 (citations omitted).

"Further, when the circumstances involve an informant's tip, courts must examine whether the tipster's information contained sufficient indicia of reliability to provide law enforcement with a reasonable suspicion that would justify the stop." *Barbarich*, 291 Mich App at 474. "To assess the reliability of a tip, the Michigan Supreme Court has mandated that courts consider, given the totality of the circumstances, '(1) the reliability of the particular informant, (2) the nature of the particular information given to the police, and (3) the reasonability of the suspicion in light of the above factors.'" *Id.*, quoting *People v Tooks*, 403 Mich 568, 577; 271 NW2d 503 (1978). However, "less information is required from citizen informants reporting contemporaneous incidents of erratic or potentially dangerous driving to justify an investigative stop . . . ." *Id.* at 479. "[W]hile the quantity of the tip's information must be sufficient to identify the vehicle and to support an inference of a traffic violation, less is required with regard to a tip's reliability; as to the latter, it will suffice if law enforcement corroborates the tip's innocent details." *Id.* at 479-480.

Since this Court's decision in *Barbarich*, the United States Supreme Court issued its opinion in *Navarette v California*, 572 US ___; 134 S Ct 1683; 188 L Ed 2d 680 (2014), which clarified when an officer may perform a traffic stop on the basis of an anonymous caller's tip.

In *Navarette*, officers of the California Highway Patrol received notice that a 911 caller had reported that the driver of a Silver Ford 150 pickup had run the caller off the road near marker 88 on the southbound side of the highway. *Id.* at 1686-1687. The officers responded and stopped the driver of a truck that fit the description and location provided by the caller. *Id.* at 1687. When the officers approached the truck, they smelled marijuana and discovered 30

pounds of it in the back of the truck. *Id.* The defendants moved to suppress the evidence of the marijuana on the grounds that the stop violated their Fourth Amendment rights. *Id.* Specifically, they argued that the officers did not have a reasonable suspicion of criminal activity sufficient to warrant the stop. *Id.* The trial court denied the motion. *Id.*

On appeal, the Supreme Court first emphasized that officers may legitimately rely on anonymous tips when deciding whether to make a traffic stop: "We have firmly rejected the argument 'that reasonable cause for a[n investigative stop] can only be based on the officer's personal observation, rather than on information supplied by another person.' " *Id.* at 1688, quoting *Adams v Williams*, 407 US 143, 147; 92 S Ct 1921; 32 L Ed 2d 612 (1972). Although the Court recognized that anonymous tips will seldom demonstrate the informants basis for knowledge or veracity, "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.' " *Navarette*, 134 S Ct at 1688, quoting *Alabama v White*, 496 US 325, 327; 110 S Ct 2412; 110 L Ed 2d 301 (1990).

Turning to the facts, the Court determined that the caller's tip had adequate indicia of reliability to warrant the officers' reliance. *Id.* at 1688-1689. The Court stated that the caller's identification of a specific vehicle—a silver Ford pickup with a particular license plate— demonstrated that the caller "claimed eyewitness knowledge of the alleged dangerous driving." *Id.* at 1689. The fact that the truck was discovered at a location that was consistent with the tip showed that the report was the "sort of contemporaneous report [that] has long been treated as especially reliable." *Id.* The Court also found it noteworthy that the tip was relayed via the 911 call system, which had features that allow for the identifying and tracing of callers to "provide some safeguards against making false reports with immunity." *Id.* Accordingly, a reasonable police officer "could conclude that a false tipster would think twice before using such a system." *Id.* at 1690.

Viewed from the standpoint of an objectively reasonable police officer, the Court further stated, the behavior alleged in the call created a "reasonable suspicion of an ongoing crime such as drunk driving as opposed to an isolated episode of past recklessness." *Id.* The caller's report involved more than a mere "minor traffic infraction" or a "conclusory allegation of drunk or reckless driving." *Id.* at 1691. "Instead, she alleged a specific and dangerous result of the driver's conduct: running another car off the highway. That conduct bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness." *Id.* Finally, the Court rejected the contention that the officers involved had an obligation to surveil the truck to verify the report before making the stop:

> Nor did the absence of additional suspicious conduct, after the vehicle was first spotted by an officer, dispel the reasonable suspicion of drunk driving. It is hardly surprising that the appearance of a marked police car would inspire more careful driving for a time. Extended observation of an allegedly drunk driver might eventually dispel a reasonable suspicion of intoxication, but the 5–minute period in this case hardly sufficed in that regard. Of course, an officer who already has such a reasonable suspicion need not surveil a vehicle at length in order to personally observe suspicious driving. Once reasonable suspicion of drunk driving arises, "[t]he reasonableness of the officer's decision to stop a

suspect does not turn on the availability of less intrusive investigatory techniques." This would be a particularly inappropriate context to depart from that settled rule, because allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences. [*Id.* at 1691-1692 (citations omitted).]

## C. APPLICATION OF THE LAW

As a preliminary matter, we note that this case is not about whether the anonymous caller was justified in reporting Richer to the police department or whether her statements proved to be true. It is also not about whether the caller had an ulterior motive for calling the police department. As related by the Court in *Navarette*, the sole question is whether there were sufficient indicia of reliability in her statements to provide Leuzzo with a reasonable suspicion to make an investigatory stop. *Id.* at 1688. We conclude that there were sufficient indicia of reliability.

The caller's statements suggested that she contemporaneously witnessed Richer drinking alcohol at the bar and knew that he had just driven away. See *id.* at 1689. Indeed, the caller identified Richer's truck, provided the license plate number to the officers, and described his probable location and destination after leaving the bar. Leuzzo also recalled that the report included that Richer was under the influence, which was consistent with the caller's statement that she was concerned for the safety of Richer's female companion. The statement of concern strongly suggested that the caller personally observed that Richer was not in a condition to drive. Moreover, although the caller was anonymous, she identified Richer by name, identified herself as a coworker, described his truck in detail, and then stated his destination. Accordingly, an officer hearing this report might reasonably conclude that the caller personally knew Richer, knew his companion, and, therefore, understood that she could be readily identified in the event that her report was false. See *id.* at 1690.

Taking the totality of these circumstances into account, we conclude that the indicia of reliability were sufficient to provide Leuzzo with a reasonable suspicion that Richer was driving under the influence. *Id.* at 1692. Finally, as the Supreme Court explained, drunk driving is such a dangerous activity that an officer does not need to place the suspected drunk driver under surveillance to personally observe suspicious driving; the officer may make an immediate investigatory stop. *Id.* at 1691-1692.

## III.  CONCLUSION

It was reasonable under the totality of the circumstances for Leuzzo to stop Richer to investigate whether he was in fact driving under the influence.  Consequently, the trial court did not err when it denied Richer's motion to suppress on the ground that Leuzzo did not have a reasonable suspicion to execute the stop.

Affirmed.


/s/ William B. Murphy
/s/ David H. Sawyer
/s/ Michael J. Kelly